**UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **JUDITH A. MANSFIELD**<br><br>**Plaintiff,**<br><br>v.<br><br>**THE UNITED STATES,**<br><br>**Defendant.** | **Civil Action No. 05-472C**<br>**Judge Mary Ellen Coster Williams** |

**PLAINTIFF JUDITH A. MANSFIELD'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

Plaintiff Judith A. Mansfield, by and through counsel, hereby submits the following memorandum of contentions of fact and law pursuant to Rule 14, Appendix A, of the Rules of the United States Court of Federal Claims.

## I. FACTS

### A. Plaintiff's Statement of Facts

Plaintiff Judith A. Mansfield has almost 40 years of experience at the Library of Congress. She began her career at the Library on July 1, 1969 and has continued to the present. Ms. Mansfield's work performance has been consistently rated as "outstanding" or "commendable." For the past several years, Ms. Mansfield has held positions at the Senior Level and performed Senior Level duties for the Library of Congress, but the Library has chosen to pay her at the rate of a GS level employee, a rate of pay substantially below the rate of a Senior Level employee. Several male employees of the Library have performed the same duties –or duties of substantially equal skill, effort and responsibility– as Ms. Mansfield has performed, but have been paid as Senior Level employees.

In 2002, Ms. Mansfield became the Acting Director for Cataloging, a Senior Level position

formerly held by Beacher Wiggins. In August 2004, Ms. Mansfield's official title changed to "Assistant Director for Bibliographic Access," but her duties remained the same until April 13, 2005. While the Library had paid Mr. Wiggins at the Senior Level when he was Director for Cataloging, the Library only paid Ms. Mansfield at the Senior Level for two 120-day periods in the two and a half years she performed the same work (from September 2002 through April 2005). Additionally, two other male assistant directors were paid at the Senior Level for work that was equal in skill, effort, and responsibility to Ms. Mansfield's assistant director work.

Because Ms. Mansfield complained about this unfair pay, the Library took away her position as Assistant Director for Bibliographic Access, at which point Ms. Mansfield returned to exclusively performing the position of Chief of the Arts and Sciences Cataloging Division. Despite the fact that this position had been evaluated as a Senior Level position in 2003, the Library insisted on keeping Ms. Mansfield at the GS-15 level from April 2005 until the present. Yet, John Byrum, who the Library admits performed substantially equal duties to Ms. Mansfield, was paid at the Senior Level for his division chief work. Moreover, Ms. Mansfield supervised Mr. Byrum for more than two and a half years, and still the Library paid Ms. Mansfield substantially less than her male subordinate. Through this course of conduct, the Library has repeatedly and willfully violated the Equal Pay Act.

More specifically, Plaintiff expects to prove the following facts in support of her claims:

**Acting Director For Cataloging/**
**Assistant Director for Bibliographic Access**

1. First as Acting Director for Cataloging and then as Assistant Director for Bibliographic Access, during the period from September 16, 2002 through April 13, 2005, Ms. Mansfield performed the duties of the Director for Cataloging, a Senior Level position, but was paid

at the GS-15 rate for the majority of time she held the position, (all but for two 120-day periods).

2. For the entire time that Ms. Mansfield carried out the Director for Cataloging position, she performed the exact same duties and had the same responsibilities as her male predecessor, the former Director for Cataloging, Beacher Wiggins. Throughout the time Plaintiff held the position of Acting Director for Cataloging, the job required the same skill, effort, and responsibility as the job had required of Mr. Wiggins.

3. In contrast to Ms. Mansfield, when Mr. Wiggins, a male, was the Director for Cataloging, he was paid at the Senior Level from 1997 to 2002.

4. Defendant admits that the Director for Cataloging position is a Senior Level position. The position was Senior Level due to the span of control, number of staff, and interface with Congress, other library constituents, and other national libraries.

5. When filling the Director for Cataloging position, Ms. Mansfield administered and oversaw a budget of approximately $40M, supervised eight divisions, and managed a staff of over 500 employees. Ms. Mansfield also oversaw the establishment of technical policies and procedures, e.g., international standards and LC standards that are internationally implemented. She oversaw major national and international programs, e.g., Cataloging in Publication, Program for Cooperative Cataloging, and Dewey Decimal Classification. She took the lead on matters relating to national and international cataloging policy issues. She served on committees of professional organizations. She gave speeches to national-level professional groups.

6. Ms. Mansfield led major multi-year planning efforts, resulting in a 5-year strategic plan. As a full member of the Library Services management team, she participated in and contributed to decision-making on both policy and administrative matters and attended the director's meetings

which involved strategic planning. The Senior Level staff at the Library do the strategic planning for the Library's future.

7. Ms. Mansfield's Director for Cataloging duties included working with other national libraries, which is the "kind of thing that a Senior Level person would do."

8 Ms. Mansfield performed the job very well and she is a good manager.

9. Ms. Mansfield first began performing the duties of Director for Cataloging in September 2002, when she was promoted to Acting Director for Cataloging to fill in for Mr. Wiggins while he was appointed Acting Associate Librarian for Library Services. At this time, the Director for Cataloging position was rated as a Senior Level position.

10. At this time, Ms. Mansfield was promoted to the Senior Level. After 120 days, the Library removed Ms. Mansfield from the Senior Level. Ms. Mansfield then worked for a year as Acting Director for Cataloging, but was paid at the GS level.

11. The Library wanted Ms. Mansfield to continue as Acting Director for Cataloging both because of her performance and the continuity that would provide.

12. The Library benefitted from keeping Ms. Mansfield in the Senior Level position because she could continue the "many fine initiatives" she started as Acting Director for Cataloging. Still, the Library did not pay Ms. Mansfield at the Senior Level for this Senior Level work.

13. As Acting Director for Cataloging, Ms. Mansfield served as the immediate supervisor to John Byrum, a Senior Level employee, but was paid less.

14. In February, 2004, Defendant returned Plaintiff to the Senior Level pay plan for a 120 day period ending in June, 2004. On June 9, 2004, Defendant returned Plaintiff to a GS-15 pay status, and Defendant has since continued to pay her in that status.

15. Despite her return to the GS-15 pay status on June 9, 2004, Ms. Mansfield continued to carry out the duties of the Acting Director for Cataloging position.

16. For the entire time she served as Acting Director for Cataloging, Ms. Mansfield worked at the Senior Level.

17. In the spring of 2004, Defendant began a realignment of Library Services. As part of the realignment, certain directorates were combined such that Library Services would only consist of five directorates instead of seven. Due to the size of the new directorates, assistant directors became necessary to manage the directorates.

18. In April 2004, Ms. Marcum asked Ms. Mansfield to serve as the Assistant Director for Cataloging. Mr. Wiggins recommended Ms. Mansfield for the position because of how well she had done as Acting Director for Cataloging.

19. Ms. Mansfield accepted the position.

20. Ms. Marcum and Mr. Wiggins were pleased that Ms. Mansfield accepted the offer.

21. The cataloging directorate and acquisitions directorate were combined and renamed as "Acquisitions and Bibliographic Access." "Bibliographic Access" means "Cataloging." This directorate would have two assistant directors.

22. The Collections and Services directorates were also combined into one large directorate. As a result, this directorate was to have two assistant directors.

23. In the realignment of the Library Services, Ms. Mansfield would become the Assistant Director for Bibliographic Access. In this position, she continued to report to Mr. Wiggins.

24. On July 2, 2004, Beacher Wiggins officially become the director of Acquisitions and Bibliographic Access.

25. Ms. Mansfield began working as Assistant Director for Bibliographic Access in July 2004.

26. On August 6, 2004, the Library announced and made official the appointment of Ms. Mansfield to Assistant Director for Bibliographic Access; Steve Herman to Assistant Director for Collections Management; and Mark Dimunation to Assistant Director for Special Collections and Services. The Library's 2004 annual report listed the appointments of the assistant directors.

27. As Assistant Director for Bibliographic Access, Ms. Mansfield continued to carry out the work she had done as Acting Director for Cataloging. Plaintiff performed the same duties as Mr. Wiggins (who had been paid at the Senior Level) had as Director for Cataloging, and the job required the same skill, effort, and responsibility as the job had required of Mr. Wiggins when he had served as Director for Cataloging. Whereas the Library promoted Wiggins to the Senior Level when he became Director for Cataloging, the Library insisted on paying Ms. Mansfield at the GS-15 level when she performed the same job.

28. The Assistant Director for Bibliographic Access job required the same level of skill, ability, and responsibility as other Senior Level managers within the Library of Congress.

29. As an Assistant Director, Plaintiff occupied a position on the same level within the Library's hierarchy as Mr. Herman and Mr. Dimunation. For example, all three assistant directors attended the directors meetings and took part in the discussions about the future direction of Library Services.

30. Ms. Mansfield's position required at least as much skill, effort, and responsibility as the assistant director positions of Mr. Dimunation and Mr. Herman.

31. In fact, as Assistant Director, Ms. Mansfield performed a broader range of more

complex duties than her Assistant Director counterparts, Mr. Dimunation and Mr. Herman. Ms. Mansfield's Assistant Director duties were a continuation of her Acting Director duties with additional responsibilities. After the realignment, the Library added a ninth division to her span of control. Additionally, her budget increased to $44M. As she had performed as Acting Director for Cataloging, Ms. Mansfield managed initiatives regarding cataloging, carried out and created tactical plans, built on the strategic plan, and worked with the division chiefs.

32. Mr. Dimunation and Mr. Herman did not have the same history in relation to their assistant director jobs, and the Library demanded of them performance of duties of lesser importance. Mr. Wiggins wanted Ms. Mansfield to continue in her Acting Director for Cataloging role. Ms. Mansfield did more than coordinate the activities of Bibliographic Access. Indeed, Mr. Wiggins had Ms. Mansfield continue to manage the cataloging directorate just as she had as Acting Director for Cataloging. Ms. Mansfield made decisions, handled personnel maters, and handled the budget for Bibliographic Access.

33. Mr. Dimunation and Mr. Herman were not called upon by their supervisor, Carolyn Brown, to perform the same level of work in their assistant director capacities as Ms. Mansfield performed. Mr. Dimunation and Mr. Herman played more of a coordinating role.

34. Neither Mr. Dimunation nor Mr. Herman had someone fill their division chief jobs when they were assistant directors. Ms. Mansfield's assistant director duties, on the other hand, consumed her entire workday and the Library relied upon other employees to perform Ms. Mansfield's division chief duties while Ms. Mansfield served as Assistant Director.

35. Yet, Mr. Herman and Mr. Dimunation, two male employees of the Library, were paid at the Senior Level, while Plaintiff was paid at the GS-15 level. Ms. Mansfield was the only

assistant director in the new organization that was not Senior Level. Additionally, all of the other directors in the new organization were Senior Level.

36. Since September of 2002, first as Acting Director for Cataloging and then as Assistant Director for Bibliographic Access, Plaintiff served as the immediate supervisor of Mr. Byrum, the male Chief of the Regional and Cooperative Cataloging Division and a Senior Level employee of the Library.

37. As the immediate supervisor of this Senior Level male employee, Plaintiff's work was substantially equal to that of an employee of the opposite sex and the performance of her job has required at least as much (if not more) skill, effort, and responsibility as the work required of Mr. Byrum. Throughout this period, Plaintiff was paid substantially less than Mr. Byrum.

38. The Library led Ms. Mansfield to believe that her pay would be adjusted in light of her appointment to the Assistant Director of Bibliographic Access position. On August 6, 2004, Deanna Marcum, the Associate Librarian for Library Services, informed the Assistant Directors that their position descriptions would be re-written to reflect their appointments.

39. Ms. Mansfield and Mr. Wiggins had several conversations about the grade of her position shortly after her appointment to Assistant Director for Bibliographic Access. Ms. Mansfield expressed to Mr. Wiggins that her Assistant Director for Bibliographic Access position should be a Senior Level position and Mr. Wiggins agreed.

40. Mr. Wiggins recommended to Ms. Marcum that the Library upgrade Ms. Mansfield's position to the Senior Level. He pointed out that Ms. Mansfield was not just a division chief but also an assistant director. He also pointed out that Ms. Mansfield does very good work and that it was a matter of "fairness."

41. In October, 2004, Plaintiff asked Mr. Wiggins about the status of the position description. In this conversation, Ms. Mansfield also informed Mr. Wiggins that the two male Assistant Directors were paid at the Senior Level. On the same day, Mr. Wiggins told Ms. Mansfield that the Library would be able to finish her new position description and pay her at the Senior Level. Within a couple weeks, Mr. Wiggins again indicated that he was working on re-writing her position description in order to upgrade her Assistant Director position.

42. In late October 2004, Plaintiff stated to Mr. Wiggins that paying her at the GS level while the two male Assistant Directors (Mr. Dimunation and Mr. Herman) were paid at the Senior Level might violate the Equal Pay Act. Mr. Wiggins recalls Ms. Mansfield telling him that the Library paid her less than a male performing comparable duties. Putting Ms. Mansfield at the Senior Level would have been fair compensation.

43. Mr. Wiggins tried to get Ms. Mansfield's Assistant Director position raised to the Senior Level. To that end, Mr. Wiggins spoke to Ms. Marcum on more than one occasion and to Jim Carroll, the administrative assistant for Library Services. Mr. Wiggins pointed out to Ms. Marcum that of the three Assistant Directors, Ms. Mansfield was the only one who was not paid at the Senior Level.

44. On January 12, 2005, Mr. Wiggins forwarded a new position description for Ms. Mansfield's Assistant Director position to Deanna Marcum. Mr. Wiggins informed Ms. Mansfield of this fact.

45. Mr. Wiggins felt very strongly that Ms. Mansfield's assistant director position was a Senior Level position. Mr. Wiggins knew that the work he was assigning to Ms. Mansfield was Senior Level work. While the Library could have put an employee who was already graded at the

Senior Level in the position, the Library chose Ms. Mansfield because she was the "best person" for the job.

46. In conversations from January to March 2005, Ms. Mansfield stated to Mr. Wiggins that the manner in which the Library paid her in comparison to her male counterparts violated the Equal Pay Act. On March 8, 2005, Mr. Wiggins indicated to Ms. Mansfield that he informed Ms. Marcum that Ms. Mansfield felt there was a violation of the Equal Pay Act.

47. On March 15, 2005, having obtained no resolution through her immediate supervisor, Plaintiff hand delivered a letter to the Librarian of Congress in which she stated: "My compensation at a lower grade for Senior Level work is clearly unfair and illegal. My pay is lower than that of employees of the opposite sex, while performance of my work requires skill, effort, and responsibility that is equal to that of Senior Level employees of the opposite sex, working under similar conditions in the same establishment. This is a continuing violation of the Equal Pay Act of 1963, as well as a violation of Title VII of the Civil Rights Act of 1964." Plaintiff also requested a response within 10 business days.

48. Despite Ms. Mansfield's "excellent" performance as Assistant Director for Bibliographic Access, rather than remedy the unequal payment for equal work, the Library abolished her position, along with the other two Assistant Director positions.

49. On March 31, 2005, the Library informed Ms. Mansfield that the assistant director positions were being abolished.

50. The Library abolished Ms. Mansfield's position because she complained of violations of the Equal Pay Act and Title VII. Additionally, the Library abolished the positions in order to avoid paying Ms. Mansfield equal pay for equal work.

**Chief of the Arts and Sciences Cataloging Division**

51. Upon the elimination of Ms. Mansfield's Assistant Director for Bibliographic Access position, Ms. Mansfield returned to exclusively performing the position of Chief of the Arts and Sciences Cataloging Division.

52. Ms. Mansfield had held this position since May 1, 1998. As division chief, Ms. Mansfield has directed the Arts and Sciences Cataloging Division, one of the divisions within the Cataloging directorate. During the time that Ms. Mansfield had carried out the Director for Cataloging duties, her division chief position was handled on a temporary basis by rotating volunteers.

53. Ms. Mansfield was hired into the division chief position at Grade GS-15. Nevertheless, the position should have been graded at the Senior Level.

54. The duties of the ASCD Chief had not been reviewed since 1992 to determine whether the position was appropriately classified at the GS-15 level.

55. Since 1992, the duties of the ASCD Chief position have changed significantly with the advent of the Internet and digital publishing and the consequent globalization of the impact of the work of the division. As a result the position became more complex. Mr. Wiggins, who supervised Ms. Mansfield in her division chief position, believed that the position deserved the Senior Level as of the 2000 to 2001 time period. Mr. Wiggins was knowledgeable about the level of skill, effort, and responsibility required of the division chiefs.

56. In this position, Ms. Mansfield has carried out Senior Level duties. Ms. Mansfield has administered and overseen a budget of approximately $4M; directed the work and managed human resources of the division, which includes 7 sections and a pilot project with a total of about

60 staff; obtained resources and dealt with officials to assure proper implementation of changed procedures; monitored progress toward division goals; overseen the implementation of technical policies and procedures, including international standards; initiated and set agenda for regularly-scheduled meetings of technical services and cataloging managers from other major national libraries (Library & Archives Canada, National Library of Australia, British Library, and Deutsche Nationalbibliothek) to discuss cataloging and access matters of mutual interest; played a leadership role in major multi-year planning efforts, e.g., played a key role in developing and overseeing the Cataloging Directorate's action plan (*Bibliographic Control of Web Resources: A Library of Congress Action Plan*) that resulted from the 2000 Bicentennial Conference on Bibliographic Control for the New Millennium; worked with professional organizations and individuals outside of the Library of Congress; assumed a leadership and management role in directorate-wide initiatives, such as co-chairing the committee charged with planning the directorate's re-organization; represented Library Services and coordinated the Library Services' role in the Copyright Office Business Process Re-engineering effort, including oversight of pilot projects to improve workflows between the two organizations; served on committees of professional organizations; and gave speeches to national-level and regional professional groups.

57. The Library admits that Ms. Mansfield's division chief position held by Ms. Mansfield required "substantially equal skill, effort, and responsibility" as the division chief position held by Mr. John Byrum, Chief of the Regional and Cooperative Cataloging Division, which is graded at the Senior Level.

58. Beginning in 2001, Mr. Wiggins made requests for a classification review of Ms. Mansfield's Chief position.

59. The classification review was completed in April 2003 and determined that Ms. Mansfield's position justified reclassification at the Senior Level.

60. Following the audit, on April 25, 2003, the Acting Associate Librarian for Library Services recommended that the Library reclassify the position of Chief of the Arts and Sciences Cataloging Division to the Senior Level, because it required Senior Level work.

61. Defendant ignored the classification review: Defendant did not increase Ms. Mansfield's compensation to the Senior Level, the rate at which it was paying Mr. Byrum, who was performing the same work as Chief of the Regional and Cooperative Cataloging Division. To date, Plaintiff has been paid less than a male employee in a position requiring equal skill, effort, and responsibility. Nor did the Library remove any of the Senior Level duties required of Ms. Mansfield.

62. Additionally, Ms. Mansfield's duties as division chief were substantially equal in skill, effort, and responsibility to the duties of Mr. Dimunation and Mr. Herman.

**The Library Acted Willfully**

63. The Library knew that Ms. Mansfield was performing equal work to her male colleagues while receiving less pay for substantially similar work.

64. In 2003, the Library received the results of a desk audit that indicated that Ms. Mansfield's position was equivalent to John Byrum's position. Yet, the Library never upgraded Ms. Mansfield to the Senior Level to compensate her in a pay scale that was commensurate with the pay scale upon which it compensated Mr. Byrum, nor reduced the duties that she was required to perform.

65. The Library admits the Division Chief positions of Mr. Byrum and Ms. Mansfield are substantially equal in skill, effort, and responsibility. Yet, the Library never upgraded Ms. Mansfield

to a pay scale commensurate with the pay scale upon which it compensated Mr. Byrum.

66. The Library knew that the Acting Director for Cataloging position assumed by Ms. Mansfield in 2002 was a Senior Level position. Defendant paid Mr. Wiggins at the Senior Level for performing the Director for Cataloging position. In 2003, the Library twice decided that continuing Ms. Mansfield in the position of Acting Director for Cataloging would benefit the Library. Nevertheless, the Library insisted on paying Ms. Mansfield at the GS-15 level for her Senior Level work at that time.

67. Mr. Wiggins recommended to Ms. Marcum that the Library upgrade Ms. Mansfield's position to the Senior Level. He pointed out that Ms. Mansfield was not just a division chief, but also an assistant director. He pointed out that Ms. Mansfield does very good work and that it was a matter of "fairness."

68. The Library knew that Ms. Mansfield continued the duties of Director for Cataloging when she was appointed to serve as Assistant Director for Bibliographic Access. The Library knew that these duties were Senior Level. Yet, the Library refused to upgrade Ms. Mansfield's position to the Senior Level to pay her on a scale that was commensurate with the pay scale upon which Mr. Wiggins was paid when he carried out the Director for Cataloging duties.

69. The Library knew that Ms. Mansfield, Mr. Dimunation, and Mr. Herman were all appointed to the same position within the Library's hierarchy, but while Mr. Dimunation and Mr. Herman were paid at the Senior Level, Ms. Mansfield was paid at the GS-15 level.

70. Ms. Mansfield's supervisor agreed that her position should be upgraded to the Senior Level as Assistant Director, but the Library failed to do so.

71. Ms. Mansfield informed her supervisor that the Library was paying her less in

comparison to the other assistant directors and that the Library was in violation of the Equal Pay Act; yet the Library still failed to remedy this unequal pay.

72. When Ms. Mansfield submitted a letter to the Librarian of Congress complaining that the Library was in violation of the Equal Pay Act and Title VII and indicating that she might not keep the matter private any longer, the Library abolished Ms. Mansfield's position. In so doing, the Library further demonstrated its awareness that Ms. Mansfield had been working above-grade. In short, the Library was willing to violate the Equal Pay Act as long as no one exposed the violation publically.

73. At the same time, the Library abolished the assistant director positions of Mr. Dimunation and Mr. Herman. In returning the three assistant directors to their division chief positions in April 2005, the Library knowingly maintained Mr. Dimunation and Mr. Herman at the Senior Level pay grade while returning Ms. Mansfield to a GS-15 position for which its own classification review specialist had determined should be graded at the Senior Level.

74. Deanna Marcum, the Associate Librarian for Library Services, knew the mandate of the Equal Pay Act before assuming her position at the Library.

75. Defendant willfully failed to pay Plaintiff salary and benefits equal to those of Defendant's male employees who have had and have jobs that are similar or substantially similar in terms of required skill, effort, and responsibility. Defendant did not act in good faith.

**Ms. Mansfield's Pay Loss**

76. From April 2002 to the present, Ms. Mansfield was paid at the GS-15 level except for two 120 day periods.

77. The Library paid Ms. Mansfield the following amounts on an annual basis:

| | |
|---|---|
| 2002 | $103,492 |
| 2003 | $109,887 |
| 2004 | $120,461 |
| 2005 | $121,684 |
| 2006 | $128,565 |

78. As a Senior Level employee, Mr. Wiggins' compensation was increased as follows:

| Salary/ Award | Nature of Action | Effective Date | Comment | Bates No. |
|---|---|---|---|---|
| $83,610 | Fed. Pay Adj. | 1/8/95 | (GS15/6) | (1184) |
| $85,997 | Promo - NTE | 1/16/95 | (SL) (NTE 5/15/95) | (1183) |
| $83,610 | Return to GS | 2/18/95 | (GS15/6) | (1182) |
| $85,999 | QSI | 2/19/95 | GS15/6 to GS15/7) | (1180) |
| $92,096 | Promo - NTE | 2/19/95 | (NTE - 5/15/95) | (1181) |
| $85,999 | Return to GS | 5/16/95 | | (1171) |
| $85,999 | Detail - NTE | 5/28/95 | (NTE 9/24/95) | (1178) |
| $85,999 | Term of Detail | 9/25/95 | | (1176) |
| $85,999 | Ext of Detail | 9/25/95 | (NTE 1/22/95) | (1177) |
| $92,096 | Promo - NTE | 11/12/95 | (SL) | (1175) |
| $94,437 | Fed. Pay Adj. | 1/7/96 | | (1173) |
| $88,183 | Return to GS | 3/12/96 | (GS15/7) | (1166) |
| $90,632 | W/I Grade inc | 8/18/96 | (GS15/7 to GS15/8) | (1171) |
| $94,436 | Promo - NTE | 11/10/96 | (SL) (NTE 3/9/97) | (1170) |
| $97,584 | Fed. Pay Adj. | 1/5/97 | | (1169) |
| $97,584 | Ext of Promo | 3/10/97 | (SL) | (1167) |

| | | | | |
|---|---|---|---|---|
| $105,936 | Promo | 6/8/97 | (SL)<br>(selected from Vac #960171 dated 9/17/96) | (1168) |
| $108,535 | Fed. Pay Adj. | 1/4/98 | | (1163) |
| $113,362 | SL Adj. | 5/10/98 | | (1162) |
| $117,531 | Fed. Pay Adj. | 1/3/99 | | (1160) |
| $121,171 | SL pay Adj. | 5/9/99 | | (1156) |
| $? | Hon. Award | 10/24/99 | | (1155) |
| $127,152 | Fed. Pay Adj. | 1/2/00 | | (1157) |
| $130,200 | SL Pay Adj. | 5/7/00 | (Sal. Cap) | (1159) |
| $? | Hon. Award | 7/30/00 | | (1154) |
| $133,700 | Fed. Pay Adj. | 1/14/01 | (Sal. Cap) | (1158) |
| $1,765 | Cash Award | 3/11/01 | | (1153) |
| $133,700 | SL Pay Adj. | 5/6/01 | (Sal. Cap) | (1144) |
| SF-50 missing | | | | |
| $6,000 | Cash Award | 5/5/02 | | (1151) |
| $138,200 | Reassign. | 9/1/02 | | (1152) |
| $142,500 | Fed. Pay Adj. | 1/12/03 | (Sal. Cap) | (1150) |
| $5,360 | Cash Award | 5/4/03 | | (1148) |
| $7,000 | Cash Award | 5/4/03 | | (1147) |
| $145,600 | Fed. Pay Adj. | 1/11/04 | (Sal. Cap) | (1142) |
| $145,600 | Ext. Of Detail | 3/3/04 | | (1139) |
| $6,000 | Cash Award | 5/2/04 | | (1140) |
| $5,476 | Cash Award | 5/2/04 | | (1141) |
| $149,200 | Fed. Pay Adj. | 1/9/05 | (Sal. Cap) | (1138) |
| $5,000 | Cash Award | 5/1/05 | | (1136) |

79. As a Senior Level employee, Mr. Herman's compensation was increased as follows:

| Salary/Award | Nature of Action | Effective Date | Pay System/ Pay Grade | Bates No. |
|---|---|---|---|---|
| $101,142 | Pay Adj. | 1/4/98 | (GS15/10) | (1084) |
| $500 | Cash Award | 9/13/98 | | (1083) |
| $104,851 | Fed. Pay increase | 1/3/99 | (GS15/10) | (1080) |
| $112,526 | Reclass. to SL | 3/14/99 | (SL) | (1081) |
| $? | Award | 10/24/99 | | (1079) |
| $118,079 | Fed. Pay Adj. | 1/2/00 | | (1078) |
| $123,396 | SL Pay Adj. | 5/7/00 | | (1077) |
| $128,099 | Fed. Pay Adj. | 1/14/01 | | (1076) |
| $133,700 | SL Pay Adj. | 5/6/01 | (Sal. Cap) | (1067) |
| $138,200 | Fed. Pay Adj. | 1/13/02 | (Sal. Cap) | (1073) |
| $6,500 | Cash Award | 5/5/02 | | (1072) |
| $3,000 | Cash Award | 5/5/02 | | (1071) |
| $138,200 | SL Pay Adj. | 5/5/02 | (Sal. Cap) | (1070) |
| $142,500 | Fed. Pay Adj. | 1/12/03 | (Sal. Cap) | (1074) |
| $7,000 | Cash Award | 5/4/03 | | (1068) |
| $145,600 | Fed. Pay Adj. | 1/11/04 | (Sal. Cap) | (1065) |
| $6,000 | Cash Award | 5/2/04 | | (1064) |
| $500 | Cash Award | 9/19/04 | | (1063) |
| $149,200 | Fed. Pay Adj. | 1/9/05 | (Sal. Cap) | (1062) |
| $7,000 | Cash Award | 5/1/05 | | (1081) |

80. As a Senior Level employee, Mr. Dimunation's compensation was increased as follows:

| Salary/Award | Nature of Action | Effective Date | Comments | Bates No. |
|---|---|---|---|---|
| $93,357 | Appointment | 3/30/98 | | (1060) |
| $96,790 | Fed. Pay increase | 1/3/99 | SL | (1057) |
| $100,430 | SL Pay Adjust. | 5/9/99 | | (1059) |
| $105,387 | Fed. Pay increase | 1/2/00 | | (1055) |
| $109,885 | SL Pay Adjust. | 5/7/00 | | (1054) |
| $114,074 | Fed. Pay increase | 1/14/01 | | (1051) |
| $2,715 | Cash Award | 5/6/01 | | (1053) |
| $119,723 | SL Pay Adjust. | 5/6/01 | | (1052) |
| $125,441 | Fed. Pay increase | 1/13/02 | | (1046) |
| $128,785 | Pay Adj. | 5/5/02 | | (1047) |
| $132,778 | Fed. Pay Adjust. | 1/12/03 | | (1048) |
| $134,279 | Sal. W/ locality | 1/12/03 | | (1049) |
| $138,225 | SL Pay Adjust. | 5/4/03 | | (1050) |
| $141,158 | Fed. Pay increase | 1/11/04 | | (1044) |
| $144,338 | Pay Adj correct | 1/11/04 | | (1043) |
| $2,238 | Cash Award | 5/2/04 | | (1042) |
| $145,600 | SL Pay Adj. | 5/2/04 | (Sal. Cap) | (1041) |
| $149,200 | Fed. Pay Adj. | 1/9/05 | (Sal. Cap) | (1040) |
| $7,000 | Cash Award | 5/1/05 | | (1039) |
| $149,200 | SL Pay Adj. | 5/1/05 | (Sal. Cap) | (1038) |

81. As a Senior Level employee, Mr. Byrum's compensation was increased as follows:

| Salary/Award | Nature of Action | Effective Date | Pay System/ Pay Grade | Bates No. |
|---|---|---|---|---|
| $82,697 | Fed. Pay Adj. | 1/13/91 | | (1034) |
| $86,800 | Conver to SL | 5/5/91 | SL | (1023) |
| $89,838 | Fed. Pay Adj. | 1/12/92 | | (1033) |
| $91,838 | SL Pay Adj. | 5/17/92 | | (1022) |
| $94,777 | Fed. Pay Adj. | 1/10/93 | | (1020) |
| $97,277 | SL Pay Adj. | 5/16/93 | | (1019) |
| $101,392 | Fed. Pay Adj. | 1/9/94 | | (1018) |
| $104,519 | SL Pay Adj. | 5/15/94 | | (1015) |
| $109,332 | SL Pay Adj. | 5/14/95 | | (1035) |
| $112,112 | Fed. Pay Adj. | 1/7/96 | | (1032) |
| $116,884 | SL Pay Adj. | 5/12/96 | | (1006) |
| $120,779 | Fed. Pay Adj. | 1/5/97 | | (1030) |
| $1,562 | Cash Award | 5/11/97 | | (1029) |
| $125,900 | Fed. Pay Adj. | 1/4/98 | (Sal. Cap) | (1014) |
| $4,462 | Cash Award | 5/10/98 | | (1013) |
| $4,500 | Cash Award | 5/9/99 | | (1010) |
| $? | Hon. Award | 10/24/99 | | (1009) |
| $130,200 | Fed. Pay Adj. | 1/2/00 | (Sal. Cap) | (1008) |
| $4,500 | Cash Award | 5/7/00 | | (1007) |
| $133,700 | Fed. Pay Adj. | 1/14/01 | (Sal. Cap) | (1005) |
| $? | Hon. Award | 10/7/01 | | (999) |
| $138,200 | Fed. Pay Adj. | 1/13/02 | (Sal. Cap) | (1002) |
| $6,000 | Cash Award | 5/5/02 | | (1001) |

| | | | | |
|---|---|---|---|---|
| $142,500 | Fed. Pay Adj. | 1/12/03 | (Sal. Cap) | (1004) |
| $6,000 | Cash Award | 5/4/03 | | (1000) |
| $145,600 | Fed. Pay Adj. | 1/11/04 | (Sal. Cap) | (996) |
| $? | Hon. Award | 1/11/04 | | (997) |
| $3,000 | Cash Award | 5/2/04 | | (995) |
| $3,000 | Cash Award | 5/16/04 | | (994) |
| $149,500 | Fed. Pay Adj. | 1/9/05 | (Sal. Cap) | (993) |
| $8,000 | Cash Award | 5/1/05 | | (992) |

82. There are four levels within the Senior Level pay range. The initial Senior Level pay is based on one of the four levels. The Senior Level pay is subject to a statutory cap. The statutory cap is $154,000 for 2007. If a Senior Level employee has not reached the statutory cap, any bonus award is paid to the employee as a pay adjustment or a raise. For Senior Level employees above the cap, any bonus is paid to the employee as a bonus.

**B. Plaintiff's Position with Respect to Facts upon which Defendant is expected to rely**

Defendant did not file an Answer in this case. When Plaintiff served Defendant an interrogatory seeking every fact Defendant intends to use during the trial in this case that would support all defenses raised by the Library of Congress, Defendant provided the following response:

> The Library has not raised any affirmative defenses in this matter to date. Accordingly, we are unable to identify each and every fact that we intend to use during trial that would 'support all defenses [defendant] raised.' Furthermore, because Ms. Mansfield bears the burden of proof at trial, defendant has not yet determined what facts we intend to adduce during trial.

(Def. Resp. Pl. Third Set of Interrog. to Def., 5/10/2007).) Because Defendant has not raised any affirmative defenses, for which it has the burden of proof at trial, Defendant should not be permitted

to put on evidence in support of any affirmative defenses at trial, except to the extent that such information was disclosed to the plaintiff in discovery and depositions provided to date.

Additionally, Plaintiff has sought discovery of the documents Defendant intends to use to support any defenses. In her First Request for Production of Documents to Defendant, Plaintiff sought "all documents that support or relate to any defenses raised by the Defendant Library of Congress." Defendant provided the following response:

> Any and all documents that support or related to any defenses raised by defendant have been provided to Ms. Mansfield as part of defendant's filing of its Motion to Dismiss or otherwise are being provided to Ms. Mansfield in response to Ms. Mansfield's instant Request for Production of Documents. Defendant is unaware of any additional documents that support or relate to any of its defenses.

(Def. Initial Response to Pl. Request for Production of Documents). Plaintiff also asked Defendant to provide "all documents that support any denial in your answer to the Complaint," assuming that Defendant would eventually file an answer. Defendant provided the following response: "Defendant did not file an answer to the complaint and accordingly does not have any documents responsive to this request." (Def. Resp. Pl. Third Req. Docs.)

To the extent that Defendant intends to introduce any document not already produced to Ms. Mansfield in response to her requests for production of Documents, Plaintiff objects to such documents because they were not produced in response to her requests.

Plaintiff would anticipate that Defendant would seek to rely on the facts alleged in its Motion for Summary Judgment.

**Personnel Pay System**

In its Motion for Summary Judgment, the Library argued that Ms. Mansfield's pay resulted from a bona fide gender neutral personnel pay system. However, the following facts demonstrate

that the Library did not follow its own personnel pay system in its treatment of Ms. Mansfield and, thus, it cannot prove that the pay system was the reason for her pay:

1. LCR 2017-2.1 governs the compensation system for SL staff. This regulation dictates how employees become Senior Level, the criteria for SL positions, and the appraisal system for Senior Level employees.

2. LCR 2017-2.1 is the controlling regulation for temporary promotions to SL. A GS level employee can be temporarily promoted for SL for 120 days absent a competitive announcement. If the job is not posted, under the regulations, the GS employee returns to GS after 120 days. If no posting, the Senior Level position is filled by someone else or remains vacant.

3. Ms. Mansfield was appointed to serve as Acting Director for Cataloging for 120 days in September 2002.

4. Library regulations prohibit details of GS-15 employees to a Senior Level position for more than 120 days. If the temporary promotion of a GS-15 employee to a Senior Level position is to last more than 120 days, the higher graded position must be posted.

5. In contravention of its regulations, the Library left Ms. Mansfield in the Senior Level position of Acting Director for Cataloging, but the Library did not post the Acting Director for Cataloging position.

6. The Library did not follows it own regulations when it paid Ms. Mansfield at the GS-15 level for performing the duties of Acting Director of Cataloging, a Senior Level position, for more than 120 days.

7. The library's regulations do not prevent upgrading Ms. Mansfield's positions based on an accretion of duties. Mr. Byrum's salary was adjusted from the GS-15 level to the GS-16 level,

which was subsequently converted the Senior Level Executive System, based on accretion of duties in 1985 when it was determined that he was performing duties at the higher pay rate. Mr. Herman also became an SL employee when the Library reclassified his position due to an accretion of duties.

8. Library regulations require that an employee be paid at the Senior Level if the duties of her position exceed those of a GS-15 position or that duties be removed in order to ensure that the employee's position is consistent with the GS-15 level. The Library did not follow its regulations by continuing to pay Ms. Mansfield at the GS-15 level for performing Senior Level work as ASCD Chief, Acting Director for Cataloging and Assistant Director for Bibliographic Access.

9. Nor did the Library post the Assistant Director for Bibliographic Access position. Nothing in the regulations would have prevented the LOC from posting the Assistant Director position and have Ms. Mansfield fill it.

10. If a position is posted, under the regulations, the person in the acting position could continue until the position was filled.

11. The Library does not have a specific regulation to determine how a GS employee is to be compensated for temporary promotions.

**Mr. Wiggins**

The Library argued in its Motion for Summary Judgment that Mr. Wiggins was treated the same as Ms. Mansfield when he served as Acting Director for Cataloging from 1995 to 1997. However, the following facts demonstrate that Mr. Wiggins was not treated the same:

1. As Acting Director for Cataloging during 1995 to 1997, Beacher Wiggins was paid at the Senior Level for more than 120 days per year.

2. The Library did not limit Mr. Wiggins to temporary promotions to Senior Level of

120 days per year when he served as Acting Director for Cataloging; he was promoted to the Senior Level for four 120-day periods in less than two and a half years, and he was paid at the Senior Level for approximately one half of his service as Acting Director for Cataloging.

3. When Mr. Wiggins became the Director for Cataloging, Mr. Wiggins was promoted to the Senior Level.

4. When Ms. Mansfield was appointed to Assistant Director for Bibliographic Access, essentially the same job, Ms. Mansfield was not promoted to the Senior Level.

**Seniority**

The Library argued in its motion for summary judgment that Mr. Dimunation and Mr. Herman were paid at the Senior Level while they carried out their assistant director positions because they had already been paid at the Senior Level for their division chief work. However, Ms. Mansfield also had already performed Senior Level duties as division chief:

1. When the Library appointed Ms. Mansfield as Assistant Director, she was already performing duties at the Senior Level as ASCD Chief.

2. The division chief positions of Mr. Herman and Mr. Dimunation were substantially equal in skill, effort and responsibility to Ms. Mansfield's division chief position.

3. Ms. Mansfield and Mr. Dimunation were both appointed as Division Chiefs in the Library Services unit in 1998.

4. However, Mr. Dimunation was appointed at the Senior Level, while Ms. Mansfield was appointed at the lower GS-15 level.

5. Mr. Dimunation managed a division with a smaller staff and budget than the division Ms. Mansfield managed.

6. Ms. Mansfield performed senior level duties for at least as long as Mr. Herman and Mr. Dimunation. Mr. Herman and Mr. Dimunation were paid at the Senior Level while Ms. Mansfield was not.

**Permanent Duties**

In Defendant's Motion for Summary Judgment, Defendant argued that Ms. Mansfield's assistant director duties were not intended to be permanent duties. However, at the time that the duties were assigned, Defendant did not give a time limit for her duties as Assistant Director for Bibliographic Access or otherwise indicate that the duties were temporary:

1. The creation of the assistant director positions was an "open-ended" arrangement.

2. At the time that Ms. Mansfield accepted her Assistant Director duties, she was not informed that they were not permanent duties.

3. Ms. Marcum did not convey to Steve Herman or Mark Dimunation that the assistant director duties would be for a limited time.

4. On August 6, 2004, Ms. Marcum announced that the position descriptions would be re-written to reflect the Assistant Director duties.

5. Whereas temporary duties are referenced by labeling the new title as "acting," Ms. Mansfield was not titled "acting" Assistant Director.

6. In the 2004 annual report, the Library officially announced that Ms. Mansfield, Mr. Dimunation, and Mr. Herman were appointed to the assistant director positions. In contrast, Mr. Wiggins was appointed to serve an "acting" assistant director.

**Collateral Duties**

Defendant has suggested Ms. Mansfield's duties as Assistant Director were not a significant part of her job, but rather "collateral" to her Division Chief duties. To the contrary, despite Defendant's efforts to label her Assistant Director work as "collateral," in practice the work was full time:

1. In practice, Ms. Mansfield's Assistant Director duties were not "collateral" to her Division Chief duties but consumed her entire workday.

2. While she served as Assistant Director, Ms. Mansfield assigned her Division Chief duties to another Library employee with the knowledge and consent of her supervisor, Beacher Wiggins.

3. Mr. Dimunation and Mr. Herman were not called upon to by their supervisor, Carolyn Brown, to perform the same level of work as Ms. Mansfield in their assistant director capacities. Whereas Mr. Dimunation and Mr. Herman played a coordinating role for Ms. Brown, Ms. Mansfield did more. Mr. Wiggins had Ms. Mansfield continue in her role as Director for Cataloging. As a result, as Assistant Director, Ms. Mansfield continued to manage the cataloging directorate just as she had as Acting Director for Cataloging.

4. Even in Defendant's view, Defendant added Senior Level collateral duties to a position (ASCD Chief) which required the performance of Senior Level duties, but Defendant did not increase Ms. Mansfield's compensation to the Senior Level.

**Budget**

In Defendant's Motion for Summary Judgment, Defendant argued that the Library's budget precluded upgrading Ms. Mansfield to the Senior Level. Yet, Defendant has not provided evidence

to support this affirmative defense. On the contrary, the evidence shows the following:

1. Library Services has an approximate annual budget of $200 million. Within that budget, the Cataloging Directorate had an approximate budget of $50 to $70 million, the largest budget within Library Services.

2. After the realignment of Library Services in 2004, the Acquisitions and Bibliographic Access directorate has the largest budget within Library Services.

3. The Library believed at the time that the cost of promoting Ms. Mansfield to the Senior Level would be small. Mr. Wiggins estimated that the total budgetary impact would have been $3,000 to $5,000 annually. Ms. Marcum thought the cost would have been $3,000 in salary and somewhere between $5,000 to $10,000 in bonus money, for a total cost of $8,000 to $13,000 per year.

4. In 2003, Ms. Marcum received a signing bonus of $20,000.

5. Since 2003, Ms. Marcum has received two retention bonuses of $30,000 and $32,000.

6. In the 2004-2005 time frame, more than one Senior Level employee retired.

**Jeffrey Heynen**

In the Library's motion for summary judgment, the Library argued that it did not violate the Equal Pay Act when it failed to upgrade her ASCD Chief position after the audit because Jeffrey Heynen also did not get upgraded. However, Mr. Heynen, the Chief of the History and Literature Cataloging Division, has never served as Acting Director for Cataloging, Assistant Director for Bibliographic Access, or any other position beyond his position as a Division Chief that required the performance of duties at the Senior Level.

## II ISSUES OF FACT AND LAW TO BE RESOLVED BY THE COURT

1. Whether Ms. Mansfield has established a prima facie case under the Equal Pay Act, by proving that:

   a. the work she performed was similar to that performed by employees of the opposite sex involving substantially equal skill, effort, and responsibility;

   b. that the work was performed under similar working conditions; and

   c. that the employer paid different wages to employees of opposite sexes for such work.

As discussed above, Plaintiff performed work requiring equal, and in some cases higher, skill, effort and responsibility as Beacher Wiggins, Mark Dimunation, Steve Herman, and John Byrum, all male employees, and she was paid at a lower salary for such work in a similar working environment. The Court, therefore, must decide whether in fact this is the case.

2. The relevant factual considerations would be:

a. Whether Plaintiff's duties, first as Acting Director for Cataloging and then as Assistant Director for Bibliographic Access, were equal to the duties of Beacher Wiggins.

b. Whether Plaintiff's duties, first as Acting Director for Cataloging and then as Assistant Director for Bibliographic Access, were at least equivalent to, if not higher, than the division chief duties of John Byrum.

c. Whether Plaintiff's duties as Assistant Director for Bibliographic Access were at least equivalent to, if not higher than, the duties of Steve Herman or Mark Dimunation.

d. Whether Plaintiff's duties as Chief of the Arts and Sciences Cataloging Division were equivalent to the duties of John Byrum, Steve Herman, or Mark Dimunation.

3. If Plaintiff establishes a prima facie case, whether Defendant has met its burden to prove, by

a preponderance of the evidence, that the wage differential is justified by (1) a seniority system, (2) a merit system, (3) a system pegging earnings to quality to quantity of production, or (4) any other factor other than sex. If Defendant does meet this burden of proof, whether Plaintiff establishes that Defendant's supposed justifications are a pretext for gender discrimination. The relevant factual considerations would be:

a. Whether the Library violated its own regulations by having Plaintiff serve as Acting Director for Cataloging for two and a half years, by requiring the performance of Senior Level duties without paying her at the Senior Level rate (except for two 120 day periods), and by not posting the position.

b. Whether the Library violated its own regulations by having Plaintiff carry out senior level duties as Assistant Director for Bibliographic Access and Chief of the Arts and Sciences Cataloging Division, but never upgraded her to the Senior Level pay grade.

c. Whether Mr. Wiggins was treated more favorably as Acting Director for Cataloging and as Director for Cataloging.

d. Whether the Library's efforts to cast the Assistant Director for Bibliographic Access duties as "collateral" or "not permanent" are mere labels and do not reflect the reality of the full-time senior level work that Ms. Mansfield performed in that position.

e. Whether the Library implemented a classification system to control costs or whether it ignored (or used) its classification system in order to save money by paying a female employee less than male employees for equal work.

4. Whether the Library of Congress willfully failed to pay the Plaintiff compensation equal to–or at the same Senior Level rate–as male employees. If a willful violation is found, Plaintiff's

statute of limitations would be three years for purposes of awarding backpay and relief. However, if no willful violation is found, the Plaintiff's statute of limitations would only be two years. Damages would include a determination of backpay accounting for the difference between Ms. Mansfield's salary and the amount she would have earned had she been promoted to the Senior Level pay plan in 2002, as well as a retroactive promotion. Attorneys' fees and costs will also be sought if Plaintiff prevails.

5. If liability is found, the court must determine whether Ms. Mansfield is entitled to liquidated damages. To avoid liquidated damages, the Defendant must meet its burden to demonstrate that the act or omission giving rise to the action was both 1) done in good faith and 2) it had reasonable grounds for believing the act or omission was not in violation of the FLSA, in which event the court may in its discretion award no liquidated damages or any amount thereof. Generally, liquidated damages are presumed if a violation of the Act is found. Based on the Defendant's ongoing failure to promote Plaintiff and Defendant's abolishment of her Assistant Director for Bibliographic Access job, Plaintiff contends that the violation was not in good faith nor did Defendant have any reasonable grounds to believe its acts/omissions were not in violation of the EPA.

6. In sum, the following issues are before the court:

a. Whether the Library violated the Equal Pay Act by paying Plaintiff at the GS-15 level for her work as Acting Director for Cataloging rather than at the Senior Level, the higher rate paid to her male predecessor who performed the same work.

b. Whether the Library violated the Equal Pay Act by paying Plaintiff at the GS-15 level for her work as the supervisor of a male Division Chief, who performed the same or lower level work, rather than at the Senior Level, the rate of pay at which the subordinate male employee was

compensated.

c. Whether the Library violated the Equal Pay Act by paying Plaintiff at the GS-15 level for her work as Assistant Director for Bibliographic Access, in which she performed the duties of the Director for Cataloging, a Senior Level position for which her male predecessor was paid at the Senior Level.

d. Whether the Library violated the Equal Pay Act by paying Plaintiff at the GS-15 level for her work as an Assistant Director rather than at the Senior Level, the higher rate paid to the two male Assistant Directors who were appointed at the same time and whose duties required substantially equal, (if not less), skill, effort and responsibility than Ms. Mansfield's work.

e. Whether the Library violated the Equal Pay Act by denying Plaintiff Senior Level pay for her performance as an Assistant Director, allegedly because she did not already have formal Senior Level status and in spite of the fact that she had performed Senior Level work without the formal Senior Level status and without the Senior Level pay, in contravention to the Library's own regulations.

f. Whether the Library violated the Equal Pay Act by paying Plaintiff at the GS-15 level for her work as Chief of the Arts and Sciences Cataloging Division ("ASCD") rather than at the Senior Level, the higher rate paid to a male Division Chief, who performed work that required substantially equal skill, effort, and responsibility as Ms. Mansfield's work.

g. Whether the Library violated its own regulations by ignoring the Library's classification review (which determined that the Chief of the ASCD required classification at the Senior Level) in refusing to pay Plaintiff at the Senior Level or removing the Senior Level duties.

h. Whether any and all of the Library's violations of the Equal Pay Act were willful.

## III. RELEVANT LEGAL PRINCIPLES TO BE APPLIED

### A. Legal Principles.

**The Statute**

The Equal Pay Act of 1963 ("EPA), enacted as an amendment to the Fair Labor Standards Act, 29 U.S.C. §§ 201-219, and extended to the federal government in 1974, provides as follows:

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided,* That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

29 U.S.C. §206(d)(1). The EPA was enacted as a broadly remedial statute designed to remedy the "serious and endemic" problem of sex-based wage discrimination. *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974); *Ibrahim v. United States*, 26 Cl. Ct. 359, 362 (1992). It stands for the proposition that "employees doing equal work should be paid equal wages, regardless of sex." *Goodrich v. International Brotherhood of Electrical Workers*, 815 F.2d 1519, 1523 (D.C. Cir. 1987).

**Prima Facie Case**

To establish a prima facie case under the Equal Pay Act, the plaintiff has the burden of proving that work has been performed similar to that performed by employees of the opposite sex involving substantially equal skill, effort, and responsibility; that the work was performed under

similar working conditions; and that employer paid different wages to employees of opposite sexes for such work. *See Corning Glass Works*, 417 U.S. at 195 & 203 n. 24; *Hauschild v. United States*, 53 Cl. Ct. 134 (2002); *Ibrahim*, 26 Cl. Ct at 362; *Ellison v. United States*, 25 Cl. Ct. 481, 487 (1992).

To make her prima facie case under the Equal Pay Act, the plaintiff need not show that the gap in wages is due to a discriminatory practice by the employer or that the wage disparity was sex-based. Rather, the plaintiff need only demonstrate the existence of a wage differential between male and female employees doing equal work. *Ellison*, 25 Cl. Ct. at 487; *Molden v. United States*, 11 Cl. Ct. 604, 610-11 (1987). Therefore, the plaintiff establishes a prima facie case by merely showing that the employer paid different wages to employees of the opposite sex for substantially equal work. *Ellison*, 25 Cl. Ct. at 487.

"Under the Equal Pay Act once a plaintiff makes out a *prima facie* case, she need not prove a discriminatory animus on her employer's part." *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999). "[T]he burden of proving sexual bias is met *solely* by showing the existence of a wage differential between male and female employees doing equal work." *Ellison*, 25 Cl. Ct. at 487. "The Equal Pay Act creates a type of strict liability; no intent to discriminate need be shown." *Maxwell v. City of Tucson*, 803 F.2d 444, 446 (9th Cir. 1986).

Once a prima facie case has been established, the burden shifts to the defendant to prove, by a preponderance of the evidence, that the wage differential is justified by (1) a seniority system, (2) a merit system, (3) a system pegging earnings to quality or quantity of production, or (4) any other factor other than sex. 29 U.S.C. §206(d)(1); *Corning Glass Works*, 417 U.S. at 196-97; *Ibrahim*, 26 Cl. Ct. at 362-63; *Brewster v. Barnes*, 788 F.2d 985, 991-92 (4th Cir. 1986). The defendant's burden to prove this is a heavy one. "An employer's liability under the Equal Pay Act is exempted only if

it can show that the differential is attributable to one of the four presumptively sex-neutral reasons enumerated in the statute." *Hauschild*, 53 Cl. Ct. at 139.

If the defendant fails to justify the wage differential under any of the four affirmative defenses set forth above, liability automatically is established. Unlike Title VII, which requires a showing of discriminatory intent to establish a sex-based wage differential, the Equal Pay Act plaintiff need not show intentional discrimination to establish liability. *Ryduchowski v. The Port Authority of New York and New Jersey*, 203 F.3d 135, 142 (2d Cir. 2000), *cert. denied*, 530 U.S. 1276 (2000); *Brinkley - Obu v. Hughes Training, Inc.*, 36 F 3d 336, 344 n. 17 (4th Cir. 1994); *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F. 2d 1518, 1526 (11th Cir. 1992); *Molden*, 11 Cl. Ct. at 610; *Maxwell v. City of Tucson*, 803 F. 2d 444, 446 (9th Cir. 1986); *Sinclair v. Automobile Club of Okla.*, 733 F.2d 726, 729 (10th Cir. 1984); *Hodgson v. Am. Bank of Commerce*, 447 F. 2d 416, 420 (5th Cir. 1971).

**Skill, Effort, and Responsibility**

The statutory factors of skill, effort, and responsibility regarding a job cannot be defined exactly. 29 C.F.R. §1620.14. Skill includes such factors as the level of experience, training, education, and ability needed to perform the jobs at issue. 29 C.F.R. §1620.15. Effort refers to the measurement of the physical or mental exertion needed for the performance of a job. 29 C.F.R. §1620.16. Responsibility refers to the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation. 29 C.F.R. §1620.17.

Courts have looked whether the jobs share "a 'common core' of tasks, i.e. , whether a significant portion of the two jobs is identical." *Fallon v. Illinois*, 882 F.2d 1206, 1209 (7th Cir. 1989). It is the actual job content and job requirements, not necessarily the job description, that is

controlling in determining whether the jobs are substantially equal. *Epstein v. Secretary of the Treasury*, 739 F.2d 274 (7th Cir. 1984); *Pearce v. Witchita Co. etc. Hosp. Bd.*, 590 F.2d 128, 133 (5th Cir. 1979) (holding "controlling factor under the Equal Pay Act is job content– the actual duties that the respective employees are called upon to perform"). "Insubstantial or minor differences in the degree or amount of skill, or effort, or responsibility required for the performance of jobs will not render the equal pay standard inapplicable." *Ellison*, 25 Cl. Ct. at 487.

When analyzing the equality of jobs, it is the requirements of the jobs, and not the qualifications and skills of persons holding the jobs, which must be considered. 29 C.F.R. § 1620.15. *See Soto v. Adams Elevator Equipment Co.*, 941 F.2d 543, 548-51(7th Cir. 1991); *Peltier v. City of Fargo*, 533 F. 2d 374, 377-79 (8th Cir. 1976). Moreover, it is the job content, and not the job descriptions, titles, or classifications, which must be used to determine the equality of jobs. *See*, *e.g.*, *Katz v. School District of Clayton, Mo.*, 557 F. 2d 153, 156-57 (8th Cir. 1977)(teacher's aide performing duties of teacher); *Thompson v. Sawyer*, 678 F.2d 257, 271-76 (D.C. Cir. 1982)(female bindery workers' jobs equal to male bookbinders, although they used different types of machines); *Odomes v. Nucare*, 653 F.2d 246, 250-51 (6th Cir. 1981)(female nurses aides' work substantially equal to male orderlies' work); *Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429, 451 (D.C. Cir.1976), *cert. denied*, 434 U. S. 1086 (1978) (female stewardess work equal to male purser); *Usery v. Allegheny County Institute District*, 544 F. 2d 148, 152-53 (3d Cir. 1976), *cert. denied*, 430 U.S. 946 (1977)(male barbers and female beauticians held equal jobs); *Brennan v. City Stores, Inc.*, 479 F. 2d 235, 237-38 (5th Cir. 1973), *rehearing denied*, 481 F.2d 1403 (1973)(tailor and seamstress work equal); *Brennan v. J. M. Fields, Inc.*, 488 F. 2d 443, 447 (5th Cir. 1974), *cert.denied*, 419 U.S. 881 (1973) (different method of ordering replacement merchandise did not render male hardline and

female softline jobs unequal).

**Equal Work Does Not Mean Identical Work**

The requirement of "equal work" does not meant that the comparative jobs must be identical, but only that they be "substantially equal." *Corning Glass Works*, 417 U.S. at 203, n. 24; *Ibrahim*, 26 Cl. Ct. at 362; 29 CFR § 1620.13(a). The "substantially equal" standard has been interpreted as being the middle course Congress meant to apply, between requiring that the jobs at issue be identical and that those jobs be merely comparable. *Sawyer*, 678 F.2d at 271-72. Insubstantial or minor differences in the degree or amount of skill, effort, or responsibility required for the performance of jobs will not render the equal pay standard inapplicable. 29 C.F.R. §1620.14. When comparing two jobs, the analysis must focus on the primary duties of each position, not those duties which are insubstantial or incidental. *Ellison*, 25 Cl. Ct. 481, 487 (Cl. Ct. 1992). The job viewed in its entirety, not merely selected parts, underlie the comparison. *Id.* Furthermore, differences in subject matter do not render jobs unequal if the tasks involved are the same. *See id.* at 493.

The employer must prove "substantial" additional duties of the higher paid employees, not assigned to the lower paid employees, to argue successfully that the level of responsibility is unequal. *Brennan v. Prince William Hospital Corp.*, 503 F.2d 282, 286 (4th Cir. 1974), *cert. denied*, 420 U.S. 972 (1975). "'To argue that *any* difference in ... responsibility renders jobs unequal is manifestly incorrect as a matter of law.'" *Fallon*, 882 F.2d at 1209 (internal citations omitted). *See also EEOC v. Shelby County Government, Bd. of County Comm'rs*, 707 F. Supp. 969, 983 (W.D. Tenn. 1988) ("Although [the positions of cashier and exhibits custodian are] responsible jobs, there is little difference between the degree of responsibility required for [those] jobs and other positions in the office"); *Usery v. Johnson*, 436 F. Supp. 35 (D.N.D. 1977) (sales jobs in different department were

substantially equal); *Brennan v. Sears, Roebuck & Co.*, 410 F. Supp. 84 (N.D. Iowa 1976) (despite differences in areas managed and that no two division manager jobs were wholly identical, the male and female division managers performed equal work); *Lavin-McEleney v. Marist College*, 239 F.3d 476 (2d Cir. 2001) (female professor of criminal justice and male professor of psychology were appropriate comparators).

**Similar Working Conditions**

"'Similar working conditions' encompasses two subfactors: 'surroundings' and 'hazards.' 'Surroundings' measure the elements, such as toxic chemicals or fumes, regularly encountered by a worker, their intensity and their frequency. 'Hazards' take into account the physical hazards regularly encountered, their frequency and the severity of injury they can cause." 29 C.F.R. §1620.18. *See also Corning Glass Works*, 417 U.S. at 202.

**Factor Other Than Sex**

Defendant is likely to claim that it paid Ms. Mansfield based on a factor other than sex. Under the EPA, an employer's explanation for a wage disparity must be a factor that was applied in good faith**.** *See Behm v. United States*, 68 Fed. Cl. 395, 399-400 (2005). In Defendant's motion for summary judgment, it cited *Lissak v. United States*, 49 Fed. Cl. 281 (2001) and *Belfi v. Prendergast,* 191 F.3d 129, 136 (2d Cir. 1999), contending that "[a] personnel system motivated by cost control is acceptable so long as the system is not gender based." Yet, where an employer does not actually implement a classification system in order to save money, but even violates its own classification system, the Defendant cannot avail itself of this affirmative defense. The EPA does not countenance the differential payment of wages for the same duties for *any* factor other than sex—only factors based on legitimate business reasons, *see EEOC v. J.C. Penney Co., Inc.*, 843 F.2d 249, 253 (6th Cir.

1988); *Kouba v. Allstate Insurance Co.*, 691 F.2d 873, 876-77 (9th Cir. 1982), or at the very least factors used in good faith. *See Behm*, 68 Fed. Cl. at 399-400.

Indeed, the courts in both *Lissak* and *Belfi* cases follow the majority of federal courts in adding that when an "employer offers its established policy as an explanation," it must be used reasonably "in light of the stated purpose of the policy" and "the employer's other practices." *Belfi*, 191 F.3d at 139; *Lissak*, 49 Fed. Cl. at 285; *J.C. Penney Co.*, 843 F.2d at 253; *Kouba*, 691 F.2d at 876-77. In the absence of demonstrating that a classification system required the conduct, Defendant cannot justify paying a female less for equal work in comparison to male employees simply because the discriminatory decision saved money.

**Bona Fide Classification System**

"The existence of the wage disparities, along with the fact that the disparities were known to the responsible officials, and the fact that the disparities have not been remedied, removes the bona fide status from the defendant's job classification system." *Molden*, 11 Cl. Ct. at 612-13; *Cayce*, 439 F. Supp. at 608-09 (same). In order to have a bona fide job classification system, the system must be gender neutral in its application. *Molden*, 11 Cl. Ct. at 612. Sex-based wage disparities resulting from a job classification system must be corrected in a timely fashion after reaching the attention of responsible officials. *See id*. at 612-13; *EEOC v. Maricopa County Community College District,* 736 F.2d 510, 515 (9th Cir. 1984); *Cayce v. Adams*, 439 F.Supp. 606, 608-609 (D.D.C. 1977). In *Molden*, the Court accepted a temporary pay freeze as a legitimate business reason, but required the wage discrepancies resulting from the pay freeze to be corrected "in a timely manner." *See Molden*, 11 Cl. Ct. at 612-13. The Court held that the responsible officials' knowledge of the wage disparity between male and female employees and their failure to

remedy the situation, together, removed the bona fide status of the pay freeze as a gender-neutral explanation for the wage disparity. *See id.* at 613.

Moreover, even when a freeze on promotions pending a reevaluation of the position produced the wage disparity, the employer must still act within a reasonable time to correct that disparity. In *Maricopa County Community College Dist.*, 736 F.2d at 515, the court found that two years was not a reasonable time to reclassify a position. *See also Molden*, 11 Cl. Ct. at 613 (citing *Maricopa County Community College Dist.*, 736 F.2d at 515). The employer cannot use the plaintiff to do work at a higher level and use the plaintiff's knowledge and expertise without fairly compensating her at a level equal to her male co-workers. Doing so violates the Equal Pay Act. *See Molden*, 11 Cl. Ct. at 613. Indeed, this Court has held that an employer cannot make out an affirmative defense if it was aware of the wage differential between employees of the opposite sex who performed the same duties but allowed the lower paid employee to work beyond her job classification for an unreasonable amount of time. *See Hauschild*, 53 Fed. Cl. at 143.

**<u>Consent Does Not Defeat EPA Claim</u>**

Defendants may not circumvent the mandate of the EPA, an amendment to the Fair Labor Standards Act, by claiming that an employee consented to the lower pay. In evaluating the FLSA, 29 U.S.C. § 201 *et seq.* ("FLSA"), courts have emphasized that an employer cannot justify its failure to pay an employee the appropriate wage, in violation of the statute, by simply asserting that the employee agreed to perform the work for less pay. *See Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 900-01 (1945). ("[A] statutory right conferred on a private party, but affecting the public interest, may not be waived or released in private if such waiver or release contravenes the statutory policy."). Similarly, employers cannot pay employees less than the minimum wage or decline to pay

overtime wages to non-exempt employees so long as they "consent." *See*, *e.g.*, *Robertson v. Alaska Juneau Gold Mining Co.*, 157 F.2d 876, 879 (9th Cir. 1946)("An express agreement to work for less than the basic minimum statutory rates is invalid . . ."); *Caserta v. Home Lines Agency, Inc.*, 273 F.2d 943, 946 (2d. Cir. 1959) (same).

**Similar Treatment of Male Employee Does Not Defeat EPA Claim**

This Court has stated that "it is well-established that the fact that others of different gender are similarly treated cannot defeat a plaintiff's *prima facie* showing that [she] was paid differently than a similarly situated employee of the opposite sex." *Hauschild*, 53 Fed. Cl. at 141. "The Equal Pay statute prohibits individual pay decisions based on sex–it does not require proof of a discriminatory policy." *Id.* (citing *Ellison*, 25 Cl. Ct. at 487).

**Mere Labels Do Not Defeat EPA Claim**

Once a plaintiff has established a *prima facie* case of wage discrimination under the EPA, the defendant cannot defeat the plaintiff's claim by merely pointing to the labels under which it categorizes the plaintiff's job. *Aldrich v. Randolph Cent. School Dist.*, 963 F.2d 520, 525 (2d Cir. 1992).

**Damages**

Under Section 16(b) of the FLSA, 29 U.S.C. §216 (b), an employee may bring suit for violation of the Equal Pay Act for the amount of underpaid wages and overtime compensation plus an equivalent amount of "liquidated damages." "Wages" is defined broadly, to include all forms of compensation. Fringe benefits, such as medical, hospital, accident, life insurance, and retirement benefits, bonus plans and leave are covered by the Equal Pay Act and may not be administered in a discriminatory fashion. 29 C.F.R. §1620.11. Furthermore, a plaintiff is entitled to retroactive

promotion to the time when they normally would have been promoted but for the violation of the EPA. *Molden*, 11 Cl. Ct. at 614.

A finding of willfulness under the Equal Pay Act triggers a three-year, rather than two-year, statute of limitations and thereby allows the claimant to collect three years, rather than two years, backpay. The Supreme Court in *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988), adopted the *Thurston* definition of willful conduct: "a violation is willful if the company knew or showed reckless disregard whether its conduct was prohibited by the [statute]." *Trans World Airlines v. Thurston*, 469 U. S. 111, 128-29 (1985); *Ellison*, 25 Cl. Ct. at 488.

Plaintiffs are entitled to liquidated damages for violations of 29 U.S.C. § 206 "in an additional equal amount" incurred by the violation of the EPA (pursuant to 29 U.S.C. § 216) unless the employer meets its burden in satisfying the court that the act or omission giving rise to the action was both 1) done in good faith and 2) it had reasonable grounds for believing his act or omission was not in violation of the FLSA, in which event the court may in its discretion award no liquidated damages or any amount thereof. 29 U.S.C. § 260. Accordingly, there is presumption in favor of the employee receiving liquidated damages, and then the burden then shifts to the employer. The presumption may only be overcome if the employer carries "a plain and substantial burden of persuading the court by proof that his failure to obey the statute ... was both in good faith and predicated upon such reasonable ground that it would be unfair to impose upon him more than a compensatory verdict." *Ellison*, 25 Cl. Ct. at 489. Further, even if the employer's evidence is compelling, the court retains discretion to grant liquidated damages in whole or in part. *Id*.

Section 16(b) also provides for "a reasonable attorney's fee to be paid by the defendant."

**B. Objections**

Defendant has not provided Plaintiff's counsel a final list of exhibits, as Defendant's exhibit list is not yet due. To the extent that the Defendant intends to introduce exhibits, other than what the Plaintiff has listed, Plaintiff reserves the right to object. With respect to witnesses, Defendant expressed an intention to call a number of witnesses including Robert Dizard and Teresa Smith. However, Mr. Dizard and Ms. Smith were not listed as trial witnesses in Defendant's responses to Plaintiff's interrogatories, nor were they identified as witnesses who had knowledge of Defendant's affirmative defenses. The parties are currently working to resolve this issue.

**4. BIFURCATION.**

Plaintiff does not believe bifurcation of this case is appropriate.

Respectfully submitted,
WEBSTER, FREDRICKSON & BRACKSHAW

***/s/ Bruce A. Fredrickson***

Bruce A. Fredrickson
Cedar P. Carlton
1775 K Street, N.W.
Suite 600
Washington, D.C. 20006
(202) 659-8510 (phone)
(202) 659-4082 (fax)

Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of May, 2007, a true and accurate copy of the foregoing Plaintiff's Memorandum of Contentions of Fact and Law, was electronically filed and served to:

Douglas Mickle
Commercial Litigation Branch, Civil Division
U.S. Department of Justice
Classification Unit
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530

***/s/ Bruce A. Fredrickson***

Bruce A. Fredrickson
Webster, Fredrickson & Brackshaw
1775 K Street, N.W.
Suite 600
Washington, D.C. 20006
(202) 659-8510 (phone)
(202) 659-4082 (fax)

Attorney for Plaintiff